## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| 1. LBJ Enterprises, LLC; | ) | |
| 2. Jarrett Portz; | ) | |
| 3. David Lutz; and | ) | |
| 4. Leslie LaMastus; | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. CIV-26-_____ |
| | ) | |
| 1. Dream First Bank, National | ) | |
| Association, successor by merger to | ) | |
| BancCentral, National Association; | ) | |
| 2. Chris E. Osborne; | ) | |
| 3. Taylor Horst; and | ) | |
| 4. Bill Nelson; | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiffs LBJ Enterprises, LLC ("LBJ"), Jarrett Portz ("Portz"), David Lutz ("Lutz"), and Leslie LaMastus ("LaMastus," and collectively, "Plaintiffs"), bring this Complaint against Defendants Dream First Bank, National Association ("Dream First"), successor by merger to BancCentral, National Association ("BancCentral" or the "Bank"), Chris E. Osborne ("Osborne"), Taylor Horst ("Horst"), and Bill Nelson ("Nelson," and collectively, "Defendants"), and in support allege and state as follows:

## DEMAND FOR JURY TRIAL

1.    Pursuant to Rule 38(b)(1) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all issues and claims so triable.

**PARTIES AND JURISDICTION**

2.    LBJ is an Arizona limited liability company with a principal place of business in Arizona with two members, Portz, who is a citizen of Arizona, and Mountain West Enterprises, LLC.  Mountain West Enterprises, LLC is an Arizona limited liability company with a principal place of business in Arizona with two members, LaMastus, who is a citizen of Missouri, and Brenda LaMastus, who is a citizen of Missouri.

3.    Lutz is a citizen of Nebraska.

4.    Upon information and belief, Dream First is a national banking association with its principal place of business in the State of Kansas, and therefore is a citizen of Kansas.

5.    Upon information and belief, BancCentral was a national banking association with its principal place of business in the State of Oklahoma, and therefore was a citizen of Oklahoma.

6.    On or about June 2025, the Office of the Comptroller of the Currency ("OCC") conditionally approved the merger of BancCentral with and into Dream First.

7.    Upon information and belief, Osborne is a citizen of Oklahoma.

8.    Upon information and belief, Horst is a citizen of Colorado.

9.    Upon information and belief, Nelson is a citizen of Oklahoma.

10.    Therefore, there is complete diversity of citizenship, the amount in controversy exceeds $75,000.00, and venue is proper in this district.

## FACTS

11.     On October 27, 2021, BancCentral made a loan to LBJ in the original amount of $7,860,000.00 (the "Note").   Contemporaneous with the making of the Loan, LBJ executed a Loan Agreement (the "Loan Agreement") and Portz and LaMastus (each a "Guarantor," and together, "Guarantors") entered a Guaranty Agreement related to the Note (the "LBJ Loan Guaranty," and together with the Note and Loan Agreement, the "LBJ Loan").

12.     Lutz is not a party to the Note, Loan Agreement, or LBJ Loan Guaranty.

13.     For the avoidance of doubt, Lutz is not a Guarantor.

14.     The Note, Loan Agreement, and LBJ Loan Guaranty provide that they "shall be governed and construed in accordance with the laws of the State of Oklahoma."

15.     Prior to the making of the LBJ Loan, on October 29, 2021, BancCentral made a loan to CHDP Lake Havasu, LLC ("CHDP Lake Havasu"), an affiliate of CHDP, to partially finance the construction of an ASC in Lake Havasu City, Arizona, and a Promissory Note (collectively the "LHC Loan"). Contemporaneous with the making of the LHC Loan, Portz, Lutz, and others entered a Guaranty Agreement related to the LHC Loan (the "LHC Guaranty").

16.     CHDP has two members, Portz and Aristotle Investment Holdings, LLC ("Aristotle").  Aristotle has one member, Lutz.

17.     In November 2021, the OCC and BancCentral entered into a Consent Order. Pursuant to the Consent Order, the Comptroller found that:

[T]he Bank has engaged in unsafe or unsound practices regarding management and board supervision, strategic and capital planning, risk ratings and loan review, credit administration, and the allowance for loan and lease losses. These unsafe or unsound practices resulted in violations of 12 U.S.C. § 161.

18.    The Consent Order further provides that "[t]he Bank shall achieve by March 31, 2022, and thereafter maintain… a leverage ratio at least equal to nine percent (9%)."

19.    Upon information and belief, BancCentral's liquidity and capitalization issues were at all relevant times problematic for BancCentral.  To wit, the Consent Order required BancCentral to maintain a total capital ratio of at least equal to thirteen percent (13%) and leverage ratio of at least equal to nine percent (9%), to which, based on publicly available information, BancCentral failed to maintain during the first, second, and third quarters of 2022, the fourth quarter of 2023, and the first quarter of 2024.

20.    On March 17, 2022, BancCentral made an additional loan to CHDP Lake Havasu, an affiliate of CHDP, to further finance the construction of the Lake Havasu ASC, and a Promissory Note (collectively the "LHC 2 Loan").  Contemporaneous with the making of the LHC 2 Loan, Portz, Lutz, and others entered a Guaranty Agreement related to the LHC Loan (the "LHC 2 Guaranty").

21.    Pursuant to 12 C.F.R. § 32.3(a), "[a] national bank's or savings association's total outstanding loans and extensions of credit to one borrower may not exceed 15 percent of the bank's or savings association's capital and surplus".  Capital and surplus means "tier 1 and tier 2 capital calculated under the risk-based capital standards applicable to the institution as reported in the Call Report".  12 C.F.R. § 32.2(c).

22.     The LHC Loan and LHC 2 Loan resulted in total outstanding loans to CHDP Lake Havasu of $10,807,800.00.  BancCentral's December 31, 2021 Call Report stated that BancCentral had capital and surplus of $38,904,000.00.  Thus, on March 17, 2022, BancCentral's loans to CHDP Lake Havasu were 27.78% of BancCentral's capital and surplus.

23.     On March 18, 2022, BancCentral made a loan to CHDP Pahrump, LLC ("CHDP Pahrump"), an affiliate of CHDP, to partially finance the construction of an ASC in Pahrump, Nevada, and a Promissory Note (collectively the "Pahrump Loan", and together with the LHC Loan, and LHC 2 Loan, the "NMTC Loans").  Contemporaneous with the making of the Pahrump Loan, Portz, Lutz, and others entered a Guaranty Agreement related to the Pahrump Loan (the "Pahrump Guaranty," and together with the LHC Guaranty, and LHC 2 Guaranty, the "NMTC Guaranty Agreements").

24.     The Pahrump Loan constituted 17.99% of BancCentral's December 31, 2021 capital and surplus.

25.     After funding the NMTC Loans, BancCentral, Osborne, Horst, and Nelson began a pattern of refusing to allow the NMTC Loans borrowers access to the NTMC Loans proceeds and alleging BancCentral has a security interest in, or other rights to, the funds held in BancCentral accounts.

26.     On August 28, 2023, certain of the Plaintiffs sent a demand letter to BancCentral requesting the immediate release of all NMTC Loans proceeds held for the Lake Havasu and Pahrump ASC projects.

27.     Portz and Lutz had numerous discussions with Defendants requesting the withdrawal of NMTC Loans proceeds contained in the relevant BancCentral accounts for purposes consistent with the NMTC Loans. After meeting personally with Horst and telephonically with Osborne, Defendants expressly approved and consented to the withdrawal of all NMTC Loans proceeds funds and made the transfers as requested. Horst and Osborne approved the withdrawal of the NMTC Loans proceeds pursuant to approved wire transfer forms executed by BancCentral and certain of the Plaintiffs.

28.     Despite having approved of, and consented to the release of NMTC Loans proceeds, and CHDP Lake Havasu and CHDP Pahrump being current on payments, on October 18, 2023, BancCentral, through counsel acting at the direction of Defendants, sent notices of default (the "Default Notices") to the NMTC Loans borrowers.

29.     Following the receipt of the Default Notices, certain of the Plaintiffs responded to BancCentral's Default Notices. Therein, Defendants were reminded that Horst and Osborne had approved of the withdrawals and had wired out the NMTC Loans proceeds. Defendants were further reminded that the NMTC Loans were current on all payments, had always been current, and CHDP Lake Havasu and CHDP Pahrump had complied with all terms of the NMTC Loans' transaction documents.

30.     Despite the response, BancCentral, through counsel acting at the direction of Defendants, sent a follow up letter again threatening a wrongful default and acceleration of the NMTC Loans.

31.     On February 2, 2024, BancCentral, through counsel acting at the direction of Osborne, Horst, and Nelson, filed suit in a matter entitled *BancCentral v. CHDP Pahrump,*

*LLC, David Lutz, Jarrett Portz, Community Health Development Partners, LLC, and Aristotle Investment Holdings, LLC*, District Court of Woods County, State of Oklahoma, Case No. CJ-2024-8 (the "Pahrump Lawsuit").

32.    On the same day, BancCentral filed suit in a matter entitled *BancCentral v. CHDP Lake Havasu, LLC, David Lutz, Jarrett Portz, Community Health Development Partners, LLC, Aristotle Investment Holdings, LLC, Desert Land Group, LLC, Luke Still, Mychal R. Gorden, Swanson Investors, L.L.C., and Jack D. Dunn*, District Court of Woods County, State of Oklahoma, Case No. CJ-2024-9 (the "Lake Havasu Lawsuit," and together with the Pahrump Lawsuit, the "NMTC Loans Lawsuits").

33.    The NMTC Loans Lawsuits falsely alleged that NMTC Loans borrowers had defaulted under the NMTC Loans.

34.    The NMTC Loans Lawsuits are verified by Nelson.

35.    BancCentral, acting at the direction of Osborne, Horst, and Nelson, having breached the NMTC Loans, had no actual or good faith basis to accelerate the notes nor make demand under the NMTC Guaranty Agreements.

36.    BancCentral, acting at the direction of Osborne, Horst, and Nelson, declared default of the NMTC Guaranty Agreements despite the fact that CHDP Lake Havasu and CHDP Pahrump were current on all payments, were always current on all payments, and had not defaulted under the loan agreements.

37.    On February 22, 2024, BancCentral, through counsel acting at the direction of Osborne, Horst, and Nelson, sent a notice of default to Plaintiffs which falsely alleges

that Plaintiffs have defaulted under the LBJ Loan (the "<u>LBJ Default Notice</u>"), which is separate and apart from the NMTC Loans.

38.    The only alleged events of default identified in the LBJ Default Notice were "(i) Borrower's failure to perform conditions of the Loan Agreement, namely by allowing an affiliate to default on other debts to the Bank, and (ii) default under other of Guarantors' agreements with the Bank."

39.    LBJ was current on all payments under the LBJ Loan at the time of the LBJ Default Notice.

40.    On February 29, 2024, Plaintiffs, through counsel, responded to the LBJ Default Notice, wherein Plaintiffs advised Defendants that the LBJ Default Notice "fails to identify with any particularity the basis for the Alleged Default, thus [Plaintiffs] must assume that the Bank's only basis for [the LBJ Default Notice] is the ongoing malicious prosecution of [the NMTC Loans Lawsuits]… For the Bank to allege default under the [LBJ] Loan, based solely on the [NMTC Loans] Lawsuits, spotlights the Bank's egregious and bad faith conduct. As you are aware, [LBJ] remains current on payments for the [LBJ] Loan."

41.    On February 29, 2024, the Lake Havasu Lawsuit was removed to this Court.

42.    On March 4, 2024, the Pahrump Lawsuit was removed to this Court.

43.    On July 2, 2024, BancCentral, through counsel acting at the direction of Osborne, Horst, and Nelson, sent a second notice of default to Plaintiffs which again falsely alleges that Plaintiffs have defaulted under the LBJ Loan (the "<u>Second LBJ Default Notice</u>," and together with the LBJ Default Notices, the "<u>LBJ Default Notices</u>").  As with

the LBJ Default Notice, the only alleged events of default identified in the Second LBJ Default Notice were "(i) Borrower's failure to perform conditions of the Loan Agreement, namely by allowing an affiliate to default on other debts to Bank, namely by allowing an affiliate to default on other debts to the Bank, and (ii) default under other of Guarantors' agreements with the Bank."

44.    LBJ was current on all payments under the LBJ Loan at the time of the Second LBJ Default Notice.

45.    The only basis for the LBJ Default Notices was BancCentral's ongoing campaign of maliciousness against Portz and Lutz.

46.    On July 22, 2024, BancCentral, through counsel acting at the direction of Osborne, Horst, and Nelson, filed suit in a matter entitled *BancCentral v. LBJ Enterprises, LLC, David Lutz, Jarrett Portz, and Leslie LaMastus*, District Court of Woods County, State of Oklahoma, Case No. CJ-2024-26 (the "LBJ Lawsuit").

47.    LBJ was current on all payments under the LBJ Loan at the time of the filing of the LBJ Lawsuit.

48.    The LBJ Lawsuit is verified by Horst.

49.    On July 24, 2024, BancCentral, at the request of Plaintiffs, provided a payoff statement for the LBJ Loan.  The payoff statement included a total sum of $6,405.00 in alleged legal fees.

50.    On September 10, 2024, the LBJ Lawsuit was removed to this Court.

51.    In September 2024, BancCentral sold the NMTC Loans to a third-party and subsequently dismissed the NMTC Loans Lawsuits without prejudice.

52.     On September 27, 2024, Plaintiffs filed a Motion to Dismiss the LBJ Lawsuit with this Court (the "Motion to Dismiss"), to which BancCentral responded on January 3, 2025 (the "Response").

53.     On January 10, 2025, Plaintiffs filed their Reply in support of the Motion to Dismiss (the "Reply").

54.     The Petition filed in the LBJ Lawsuit (the "Complaint") pleads, and the Response reiterates, "LBJ has, among other things, failed to perform under the Loan Agreement by allowing affiliates to default on other debts to the Bank," that "Portz has defaulted on multiple of his other obligations to the Bank," and "the Bank has further determined in good faith that a material adverse change has occurred." The Complaint does not contain any other allegations of default under the LBJ Loan.

55.     Moreover, as thoroughly detailed in Plaintiffs' Motion and Reply, in the absence of an event of default (as defined in the LBJ Loan), BancCentral may not accelerate the amounts due under the Note.

56.     The Note does not define events of default, instead incorporating by reference the meaning assigned in the Loan Agreement.

57.     Section 8 of the Loan Agreement enumerates an exhaustive, exclusive list of occurrences which constitute an event of default. Any act or omission by Plaintiffs not explicitly provided in Section 8 of the Loan Agreement, irrespective of Defendants's opinion or desire, does not constitute an event of default and therefore is not a breach of the LBJ Loan.

58.    Critically, a default by as yet unidentified affiliates of LBJ under other obligations to BancCentral, as alleged in the Complaint, is not an event of default under the Loan Agreement.  Similarly, a material adverse change in LBJ's financial condition, from some unalleged point in time, or the impairment of the prospect for payment or performance of the Note does not constitute a breach of the Loan Agreement.  Finally, default of a Guarantor under other obligations to BancCentral is not an event of default.

59.    Notably, neither the Complaint nor the LBJ Default Notices identify the contractual provision(s) of the LBJ Loan which Plaintiffs allegedly breached.

60.    In its Response, BancCentral did not, because it cannot, identify any provision in the LBJ Loan whereby an alleged default by affiliates of LBJ on other debts to BancCentral constitutes an event of default.

61.    The same is true with regards to "a material adverse change."  The only event of default alleged in the Complaint which BancCentral attempted to defend in its Response to Plaintiff's Motion to Dismiss is that "Portz has defaulted on multiple of his other obligations to the Bank."

62.    To that end, Plaintiff cited Section 8.9 of the Loan Agreement, which provides "[t]here shall occur with respect to any Guarantor: (i) any event described in Sections 8.4, 8.5, or 8.7; or (ii) any failure by Guarantor to perform in accordance with the terms of any <u>Loan Document</u> between such Guarantor and Bank, subject to any right to cure contained in the applicable <u>Loan Document</u>."  Loan Agreement at § 8.9 (emphasis added).  "Loan Documents means <u>this</u> Agreement, the Note, the Mortgage, the Guaranty… pursuant <u>hereto</u> or in connection <u>herewith</u>." Loan Agreement at § 1 (emphasis added).

63.    Clearly, a default by Portz under other obligations to Plaintiff is not a default under a Loan Document nor under Sections 8.4, 8.5, or 8.7, and therefore not an event of default under Section 8.9.

64.    Section 6.2 of the Loan Agreement provides that "Borrower agrees that so long as this Agreement remains in effect and until the Obligations are indefeasibly paid or performed, in full, Borrower shall take the following actions… immediately advise Bank of any litigation… which if adversely determined, could have a material adverse effect impact on… Borrower or Guarantor."[1]  Response at 3.  An alleged materially adverse event, by itself, is not a violation of Section 6.2.  Plainly, Borrower's only obligation under Section 6.2 is to "advise Bank."  The Complaint does not, because Defendants cannot, allege a disclosure required of Plaintiffs pursuant to Section 6.2 of the Loan Agreement to which BancCentral is not a party with full knowledge.

65.    A default under Section 6.2 only constitutes an event of default under the Loan Agreement if "uncured for a period of thirty (30) days after written notice from Bank to Borrower…"  Loan Agreement at § 8.4.  Here, Defendants never provided Plaintiffs sufficient written notice of an alleged default under Section 6.2 of the Loan Agreement.

66.    Section 3 of the Guaranty Agreement provides "[t]the Guarantor hereby represents, warrants, and covenants that…(e) all financial statements and information heretofore furnished to the Bank by the Guarantor do, and all… hereafter… will, fully and accurately present the condition… of the Guarantor as of their dates…"  Nothing in the

---

[1] The Response cites to § 6.5.  Plaintiffs assume BancCentral intended to cite to § 6.2.

Guaranty Agreement, including Section 3, obligates Guarantors to provide BancCentral financial information. Section 3(e) simply represents and warrants that financial information provided to BancCentral by Guarantors, *if any*, is accurate. Accepting as true BancCentral's allegation that it "made multiple requests for [Plaintiffs'] financial information… ," such allegation does not support an event of default under the Loan Agreement. Response at 4. BancCentral's statement in its Response that "[t]he failure to provide the requested financial information alone constitutes an Event of Default" is patently wrong and directly contradictory to the plain language of the LBJ Guaranty Agreement. *Id*.

67.    Simply, there is no duty under the LBJ Guaranty Agreement for Guarantors to provide BancCentral financial information.

68.    On March 3, 2025, BancCentral, at the request of Plaintiffs, again provided a payoff statement for the LBJ Loan. The payoff statement included a total sum of $25,101.08 in alleged legal fees.

69.    On March 4, 2025, Plaintiffs requested Defendants provide an itemized accounting for the LBJ Loan, including the complete history with all interest calculations and a ledger of any fees claimed. Defendants refused to provide Plaintiffs with the requested accounting, instead alleging the Bank's purported legal fees—which Defendants were extorting Plaintiffs to pay—are somehow protected by attorney client privilege.

70.    Thereafter, Plaintiffs, under protest, satisfied the LBJ Loan in full, but to date, Plaintiffs have *never* received any explanation as to the charges and fees added to the LBJ Loan by Defendants.

71.     Plaintiffs mitigation of their damages by satisfaction of the LBJ Loan has caused Plaintiffs to suffer damages, to include a higher cost of capital, fees, and charges.

72.     On March 6, 2025, BancCentral dismissed the LBJ Lawsuit without prejudice.

73.     The only basis for the LBJ Lawsuit was BancCentral's ongoing campaign of maliciousness against Portz and Lutz.

74.     Defendants had no actual or good faith basis to accelerate the Note, make demand under the LBJ Loan Guaranty, nor file the LBJ Lawsuit.

75.     On or about June 2025, BancCentral merged with and into Dream First. Thereafter, Dream First, as successor by merger to BancCentral, is liable for all acts or omissions of BancCentral.

**FIRST CAUSE OF ACTION**
**<u>BREACH OF THE LBJ LOAN</u>**
**(As to DreamFirst)**

76.     Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

77.     In the absence of an event of default, the Bank may not accelerate the amounts due under the Note.

78.     The Note does not define events of default, instead incorporating by reference the meaning assigned in the Loan Agreement.

79.     Section 8 of the Loan Agreement enumerates an exhaustive, exclusive list of occurrences which constitute an event of default under the LBJ Loan.

80.    Any act or omission by LBJ not explicitly provided in Section 8 of the Loan Agreement does not constitute an event of default and therefore is not a breach of the Loan Agreement.

81.    LBJ was not in default of the LBJ Loan at the time of the LBJ Default Notice.

82.    LBJ was not in default of the LBJ Loan at the time of the Second LBJ Default Notice.

83.    LBJ was not in default of the LBJ Loan at the time of the filing of the LBJ Lawsuit.

84.    BancCentral declared default of the LBJ Loan despite the fact that LBJ was current on all payments and had not defaulted under the clear terms of the Loan Agreement.

85.    The Bank breached the LBJ Loan by, among other things:

    a.  inventing an "Event of Default";

    b.  accelerating the maturity of the Note;

    c.  filing the LBJ Lawsuit;

    d.  depriving LBJ of the benefit of the terms of the LBJ Loan; and

    e.  subjecting LBJ to fees and charges to which BancCentral is not entitled under the LBJ Loan or at law.

WHEREFORE, LBJ prays for judgment against DreamFirst in an amount in excess of $75,000.00, plus pre- and post-judgment interest, until paid, attorneys' fees, costs of the suit, and all other relief to which LBJ is justly entitled.

## SECOND CAUSE OF ACTION
## BREACH OF THE LBJ LOAN GUARANTY
### (As to DreamFirst)

86.    Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

87.    BancCentral declared default of the LBJ Loan Guaranty despite the fact that LBJ was current on all payments and had not defaulted under the clear terms of the LBJ Loan Guaranty.

88.    The Bank breached the LBJ Loan Guaranty by, among other things:

    a.  inventing an "Event of Default";

    b.  accelerating the maturity of the Note;

    c.  filing the LBJ Lawsuit; and

    d.  subjecting Guarantors to fees and charges to which BancCentral is not entitled under the LBJ Loan or at law.

89.    WHEREFORE, Guarantors pray for judgment against DreamFirst in an amount in excess of $75,000.00, plus pre- and post-judgment interest, until paid, attorneys' fees, costs of the suit, and all other relief to which Guarantors are justly entitled.

**THIRD CAUSE OF ACTION**
**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH**
**AND FAIR DEALING/TORTIOUS BREACH**
**(As to DreamFirst)**

90.    Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

91.    Not only was there no good faith basis for the Bank to declare a default of the LBJ Loan, declare a default of the LBJ Loan Guaranty, and file the LBJ Lawsuit, but the Bank's conduct has been intentionally directed at Plaintiffs to harm them.  Further, the Bank's actions have been malicious, grossly negligent, and in reckless disregard. The Bank appears to have developed a plan to try and extract additional funds or security from Plaintiffs from which the Bank is not entitled.

92.    The Bank's actions to manufacture default of the LBJ Loan further support

that the Bank's actions sought to intentionally harm Plaintiffs and/or achieve some ulterior goal.

WHEREFORE, LBJ and Guarantors pray for judgment against DreamFirst in an amount in excess of $75,000.00, plus pre- and post-judgment interest, until paid, punitive damages, attorneys' fees, costs of the suit, and all other relief to which LBJ and Guarantors are justly entitled.

**FOURTH CAUSE OF ACTION**
**<u>NEGLIGENCE</u>**
**(As to DreamFirst)**

93.    Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

94.    The Bank had a duty to act in good faith and with ordinary care and diligence when conducting the Bank's affairs.

95.    The only reference to Lutz in the Complaint is in the caption.  There are no allegations, of any nature, pertaining to Lutz in the Complaint nor is he referenced in any of its exhibits.

96.    Nor could there be, as Lutz is not a party to the Note, Loan Agreement, or LBJ Loan Guaranty.

97.    Defendants were made aware of Lutz's baseless inclusion in the LBJ Lawsuit soon after it was filed, and in any event no later than the filing of the Motion to Dismiss on September 27, 2024 putting Defendants on notice of Lutz' inclusion for an improper purpose.

98.    Yet, at no time prior to March 6, 2025 did Defendants dismiss Lutz from the LBJ Lawsuit.

99.     Defendants had a duty to promptly dismiss Lutz from the LBJ Lawsuit upon notice of his inclusion.

100.    Defendants breached their duties to Lutz by, after clear, written notice of their conduct, failing and refusing to timely voluntarily dismiss Lutz from the LBJ Lawsuit.

101.    The Bank breached these duties owed to Plaintiffs by:

   a.  Failing to exercise due care when servicing the LBJ Loan;

   b.  Failing to exercise due care when providing payoff statements for the LBJ Loan;

   c.  Issuing the LBJ Default Notices when no default existed; and

   d.  Failing to exercise due care when filing the LBJ Lawsuit, including naming Lutz as a defendant therein.

102.    As a direct and proximate result of the negligence of the Bank, Plaintiffs have suffered damages. Said damages were directly and proximately caused by the negligence of the Bank and were incurred without contributory negligence or assumption of the risk on the part of Plaintiffs.

WHEREFORE, Plaintiffs pray for judgment against DreamFirst in an amount in excess of $75,000.00, plus pre- and post-judgment interest, until paid, punitive damages, attorneys' fees, costs of the suit, and all other relief to which Plaintiffs are justly entitled.

**FIFTH CAUSE OF ACTION**
**AIDING AND ABETTING BREACH OF THE IMPLIED**
**COVENENT OF GOOD FAITH AND FAIR DEALING/TORTIOUS BREACH**
**(As to Osborne, Horst, and Nelson)**

103.    Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

104.    Osborne and Horst were, at all relevant times, members of the Bank's board of directors.

105.    Nelson was, at all relevant times, an officer of the Bank.

106.    Not only was there no good faith basis for the Bank, acting at the direction of Osborne, Horst, and Nelson, to declare a default of the LBJ Loan, declare a default of the LBJ Loan Guaranty, and file the LBJ Lawsuit, but the Bank's conduct has been intentionally directed at Plaintiffs and others to harm them. Further, the actions of Osborne, Horst, and Nelson have been malicious, grossly negligent, and in reckless disregard.

107.    The LBJ Lawsuit is verified by Horst.

108.    Osborne, Horst, and Nelson approved the issuance of the LBJ Default Notices, wrongful acceleration of the Note, filing of the LBJ Lawsuit, and extortion of fees and charges from LBJ to which the Bank is not entitled.

WHEREFORE, Plaintiffs pray for judgment against Osborne, Horst, and Nelson in an amount in excess of $75,000.00, plus pre- and post-judgment interest, until paid, punitive damages, attorneys' fees, costs of the suit, and all other relief to which Plaintiffs are justly entitled.

### SIXTH CAUSE OF ACTION
### <u>NEGLIGENCE</u>
### (As to Osborne, Horst, and Nelson)

109.    Osborne, Horst, and Nelson had a duty to act in good faith and with ordinary care and diligence when conducting the Bank's affairs.

110.    Osborne, Horst, and Nelson breached these duties owed to Plaintiffs by:

   a. inventing an "Event of Default";

b.  accelerating the maturity of the Note;

c.  subjecting LBJ and Guarantors to fees and charges to which BancCentral is not entitled under the LBJ Loan or at law;

d.  Failing to exercise due care in the monitoring and regulation of the Bank's servicing the LBJ Loan;

e.  Failing to exercise due care in the monitoring and regulation of the Bank's providing payoff statements for the LBJ Loan;

f.  Issuing the LBJ Default Notices when no default existed; and

g.  Failing to exercise due care when filing the LBJ Lawsuit, including naming Lutz as a defendant therein.

111.  As a direct and proximate result of the negligence of Osborne, Horst, and Nelson, Plaintiffs have suffered damages. Said damages were directly and proximately caused by the negligence of Osborne, Horst, and Nelson and were incurred without contributory negligence or assumption of the risk on the part of Plaintiffs.

WHEREFORE, Plaintiffs pray for judgment against Osborne, Horst, and Nelson in an amount in excess of $75,000.00, plus pre- and post-judgment interest, until paid, punitive damages, attorneys' fees, costs of the suit, and all other relief to which Plaintiffs are justly entitled.

**SEVENTH CAUSE OF ACTION**
**FRAUD/CONSTRUCTIVE FRAUD/FRAUDULENT MISREPRESENTATION**
**(As to all Defendants)**

112.  Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

113.  Defendants made false representations to Plaintiffs, with the intent that they

be relied upon by Plaintiffs, including by issuing the LBJ Default Notices and filing the LBJ Lawsuit, with the knowledge that no event of default had occurred pursuant to the LBJ Loan.

114.    Defendants purposefully misrepresented the terms of the Loan Agreement with the intention of extorting early repayment of the LBJ Loan from LBJ and Guarantors, or extracting additional fees and charges from LBJ and Guarantors to which the Bank is not entitled, and/or out of malice stemming from the NMTC Loans Lawsuits.

115.    Defendants knew the misrepresentations were false when they were made or the Defendants made the misrepresentations recklessly without knowledge of the truth of the representations as a positive assertion.

116.    Defendants knew or should have known that by fraudulently accelerating the loan, Plaintiffs have acted to mitigate their damages, incurring transaction costs, attorney's fees, and increased costs of capital as a result.

WHEREFORE, LBJ and Guarantors pray for judgment against Defendants in an amount in excess of $75,000.00, plus pre- and post-judgment interest, until paid, punitive damages, attorneys' fees, costs of the suit, and all other relief to which LBJ and Guarantors are justly entitled.

## EIGHTH CAUSE OF ACTION
### ABUSE OF PROCESS
### (As to all Defendants)

117.    Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

118.    Defendants initiated the NMTC Loans Lawsuit and the LBJ Lawsuit for one or more improper purposes, including:

    a.   an attempt to extort early payment from Plaintiffs;

    b.   extract additional funds from Plaintiffs to which the Bank is not entitled;

    c.   to harass Plaintiffs; and

    d.   to needlessly increase the cost of litigation with Plaintiffs.

119.   Defendants had no good faith basis to file the LBJ Lawsuit against Lutz.

120.   Defendants named Lutz in the LBJ Lawsuit, despite knowledge that Lutz was not a party to the LBJ Loan or the LBJ Loan Guaranty and without any basis to justify Lutz's inclusion as a defendant therein.

121.   Defendant's sole or primary purpose in initiating the LBJ Lawsuit was improper.

122.   As a result of the LBJ Lawsuit, Plaintiffs have incurred reputational and financial damage.

WHEREFORE, Plaintiffs pray for judgment against Defendants in an amount in excess of $75,000.00, plus pre- and post-judgment interest, until paid, punitive damages, attorneys' fees, costs of the suit, and all other relief to which Plaintiffs are justly entitled.

### NINTH CAUSE OF ACTION
### CIVIL CONSPIRACY
### (As to all Defendants)

123.   Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein.

124.   Defendants acted in concert with the intent to commit the series of unlawful acts described above.

125.   As a result of Defendant's conspiracy, Plaintiffs have suffered damages.

WHEREFORE, Plaintiffs pray for judgment against Defendants in an amount in excess of $75,000.00, plus pre- and post-judgment interest, until paid, punitive damages, attorneys' fees, costs of the suit, and all other relief to which Plaintiffs are justly entitled.

Respectfully submitted,

*/s/ Lyndon W. Whitmire*
Lyndon W. Whitmire, OBA No. 17164
Jason A. Sansone, OBA No. 30913
**PHILLIPS MURRAH P.C.**
424 N.W. 10th St., Suite 300
Oklahoma City, OK  73103
Telephone: (405) 235-4100
Facsimile:  (405) 235-4133
lwwhitmire@phillipsmurrah.com
jasansone@phillipsmurrah.com
***Attorneys for Plaintiffs LBJ Enterprises, LLC, Jarrett Portz, David Lutz, and Leslie LaMastus***